UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-60948-Civ-Brannon

SERGE BRALO,

      Plaintiff,

vs.

SPIRIT AIRLINES, INC.,

      Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court on Defendant Spirit Airline's ("Spirit") Motion for Summary Judgment (DE 38). Plaintiff Serge Bralo ("Bralo") filed a Response (DE 49), and Spirit, a Reply (DE 59). The Court denied Spirit's Motion prior to trial (DE 77). This Order memorializes the Court's ruling.

Bralo filed a four-count Complaint (DE 1) against Spirit in April 2013 following its termination of his employment in July 2012. Spirit seeks summary judgment on Count I (Family Medical Leave Act Interference), Count II (Family Medical Leave Act Retaliation), Count III (Americans with Disabilities Act Discrimination), and Count IV (Florida Civil Rights Act Discrimination). For the following reasons, Spirit's Motion for Summary Judgment is DENIED.

1

## I.  Undisputed Facts[1]

Bralo worked for Spirit for approximately 14 years in various capacities, most recently as an aircraft maintenance supervisor. (DE 1). A core function of Bralo's maintenance supervisor position was ensuring passenger safety; in Bralo's words, "there's a lot of lives involved." (DE 38-4 at 8-9). The written job description for an aircraft maintenance supervisor identifies the "day to day execution and improvement of maintenance processes" as a main area of responsibility. (DE 38-3 at 1-2). Two "main purposes" of the position are "work[ing] collectively with Lead Mechanics to ensure maintenance is accomplished in compliance with Company policies and manuals" and "ensur[ing] Lead Mechanics are continuously surfacing and resolving issues that prevent the performance of work from being performed efficiently." (DE 38-3 at 1-2, 9-10). Bralo's job involved "eyes on" supervision to make sure his subordinates were performing their duties properly. (DE 38-4 at 10).

When necessary, Bralo acted as a working supervisor who worked alongside his subordinates, including climbing on and working off aircraft stands and in aircraft compartments, frequently walking, climbing ladders, bending, stooping under aircraft

---

[1] These undisputed facts come from Spirit's Motion for Summary Judgment (DE 38). Bralo's undisputed material facts in his Response (DE 49) fail to conform to the Local Rule requiring that

> [s]tatements of material facts submitted in opposition to a motion for summary judgment shall correspond with the order and with the paragraph numbering scheme used by the movant, but need not repeat the text of the movant's paragraphs. Additional facts which the party opposing summary judgment contends are material shall be numbered and placed at the end of the opposing party's statement of material facts; the movant shall use that numbering scheme if those additional facts are addressed in the reply.

Local Rule 56.1(a). Failure to follow this requirement can result in any material fact set forth in the movant's statement that is not "controverted by the opposing party's statement" being deemed admitted, "provided that the Court finds that the movant's statement is supported by evidence in the record." Rule 56.1(b). Spirit requests that all of its undisputed facts be deemed admitted because of Bralo's failure to comply with the requirements of Rule 56.1. The Court does not go so far, but has used Spirit's facts to the extent they are undisputed in the record.

engines, walking up and down aircraft, standing, and lifting up to 50 pounds. (DE 38-3 at 1-2, 5-6; DE 38-4 at 8-10, 28-29).

Spirit maintenance supervisors and aircraft mechanics must be FAA certified in airframe and powerplant maintenance. (DE 38-3 at 1, 4). Bralo, a Spirit maintenance supervisor, supervised approximately six aircraft mechanics. (DE 38-4 at 7). Bralo and his subordinates were responsible for servicing 45 to 60 planes every day, a situation Bralo described as "fast paced" and "quite a challenge," especially when any of his six subordinates was absent. (DE 38-4 at 7-8, 11). Whether Bralo would have to perform the physical aspects of his maintenance supervisor position was unpredictable, and Bralo would replicate physical aspects of his subordinates' work anywhere from 2-3 times per week to 2-3 times per day. (DE 38-4 at 8). Bralo's treating physician's assistant, Patricia Tucker, reported that Bralo's job "require[d] a lot of physical activity including climbing under equipment, etc.," causing her to delay her release of Bralo back to work because "returning is very likely to worsen his condition and cause a setback in his recovery." (DE 38-3 at 8; DE 38-4 at 29). The consequences of being short-staffed in the maintenance facility and delaying an airplane's departure included the possibility of customer complaints, FAA fines, and citations. (DE 38-4 at 10-11).

Bralo knew from his management training that Spirit outsourced its FMLA leave functions to Aetna Life Insurance Company ("Aetna"), and Bralo knew how to—and did—self-initiate a request for FMLA leave with Aetna in March 2012. (DE 38-4 at 13-14). Aetna approved Bralo for FMLA leave from March 2 to May 4, 2012. (DE 38-4 at 18).[2] On March 8 and 12, 2012, Dora Nails, an Aetna Benefits Coordinator, sent Bralo FMLA notices

---

[2] Bralo's medical leave was unrelated to any workers' compensation claim. (DE 38-3 at 9; DE 38-4 at 12).

explaining his FMLA benefits and rights. (DE 38-3 at 16-33). On March 27, 2012, Aetna retroactively approved Bralo's FMLA leave request from March 2 to March 25, 2012 and sent him another FMLA determination notice. (DE 38-3 at 34-35; DE 38-4 at 15). On April 30, 2012, Aetna approved an extension of Bralo's FMLA leave to May 4, 2012, and sent him a FMLA extension determination notice advising that (1) he might be required to provide a fitness-for-duty certification before being allowed to return to work, and (2) if he did not return to work at the end of his authorized FMLA leave, he might be terminated. (DE 38-3, at 36-37; DE 38-4 at 116). That same day, Bralo called Aetna and confirmed that he would return to work on May 5, 2012. (DE 38-3 at 38). Bralo never asked Aetna for any FMLA leave beyond May 4, 2012. (DE 38-4 at 3, 17).

On May 4, 2012, Ms. Tucker faxed a doctor's note[3] to Spirit's leave coordinator, Aggie Lang. (DE 38-3 at 39; DE 38-4, at 19, 38). Bralo did not return to work on May 5, 2012. (DE 38-3 at 39; DE 38-4 at 18). Bralo believed he would get additional FMLA leave automatically and without a request so long as he provided detailed medical records. (DE 38-4 at 16, 36)

On May 14, 2012, Ms. Tucker faxed a second doctor's note to Spirit which stated "Serge may return to work 5/20/12 @ limited duty; reduce schedule to accommodate physical therapy; lifting limited to 20lbs; avoid repetitive bending/stooping." (DE 38-3 at 40; DE 38-4 at 4-5, 38). This note did not specify the duration or frequency of Bralo's physical restrictions or the time needed for physical therapy; it contained no description of any medical condition, nor did it identify Bralo's then-current diagnosis or physical evaluation; it did not relate any medical condition to or explain the medical necessity for Bralo's past or future leaves of

---

[3] To minimize confusion, the Court refers to notes issued by Ms. Tucker as doctor's notes, although the Court recognizes that she is a physician's assistant.

absence or describe any medical condition. (DE 38-4 at 21, 22-23, 29). Bralo did not return to work on May 20, 2012, or at any time thereafter. (DE 38-3 at 38; DE 38-4 at 21, 24). Spirit had no medical information regarding Bralo's need for leave or need for accommodation other than the May 4 and May 14, 2012, doctor's notes. (DE 38-4 at 19, 20, 22, 38).

In mid-June, Ms. Lang sent Bralo a letter requesting documentation (1) supporting his leave from May 5 to May 14, (2) identifying the FMLA deficiencies in the May 14 doctor's note, (3) requesting a completed fitness-for-duty certification, and (4) warning Bralo that his failure to provide the medical information "may result in the termination of your employment." (DE 38-3 at 41-44; DE 38-4 at 25). Ms. Lang's letter sought the same medical information requested by and provided to the EEOC and the Florida Department of Economic Opportunity by Bralo's counsel. (DE 38-3. at 47-59; DE 38-4 at 34-35). The request for a fitness-for-duty certification was pursuant to Spirit's uniform practice to seek such certifications in any case where it appears the employee may not be able to perform essential job functions. (DE 38-4 at 39).

Bralo did not send Ms. Lang's letter to his physicians or ask his physicians to provide the requested medical information. (DE 38-4 at 25). Instead, Bralo's counsel wrote to Ms. Lang on June 21, 2012, requesting an extension of time within which to "fully respond" to the June 14 request for medical information. (DE 38-3 at 57-59; DE 38-4 at 26-27).

On June 25, 2012, Ms. Lang left Bralo a voicemail giving him an extension of time to June 29, 2012, to respond to her June 14 request for medical information. (DE 38-3 at 56-60; DE 38-4 at 30-31, 32, 39). On June 28 and 29, 2012, Ms. Lang called Bralo to reiterate the deadline. (DE 38-4 at 31, 39). Neither Bralo nor his attorney ever provided the medical

information requested. (DE 38-4 at 31; 34; 39). Bralo felt it was Spirit's obligation to find an accommodation for his physical restrictions. (DE 38-4 at 22-23).

By letter dated July 3, 2012, Spirit terminated Bralo's employment for failing to engage in the interactive process and provide requested medical information. (DE 38-3 at 45-46). Ms. Lang was the sole decision maker regarding Bralo's termination. (DE 38-4 at 40). Bralo has no personal knowledge that he was terminated for any reason other than those stated in Ms. Lang's July 3, 2012, letter. (DE 38-4 at 33).

Finally, for at least the last year of his employment with Spirit, the only residential address Bralo provided to Spirit was 302 Lighthouse Drive, Palm Beach Gardens, Florida, 33410. (DE 38-4 at 40). Spirit sent Bralo his 2012 W-2 to that address; Bralo received that W-2 and used it to file his 2012 tax returns, along with his 2011 year-end investment account statement (issued in 2012), and his 2011 credit-union year-end interest income statement. (DE 38-3 at 61-64).

## II.    Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a genuine dispute as to any material facts, those "most be viewed in the light most favorable to the nonmoving party." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). There is only a genuine issue of fact for trial when the record, taken as a whole, would "lead a rational trier of fact to find for the nonmoving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

B. Count 1: FMLA Interference

Spirit's motion is denied as to Count 1 because there is a genuine factual dispute regarding whether Bralo was denied an FMLA benefit to which he was entitled. *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206-7 (11th Cir. 2001).

An employee seeking FMLA leave "must communicate the reason for leave to the employer"—"unless the employer already knows that the employee has an FMLA-approved reason for leave." *Lee v. U.S. Steel Corp.*, 450 F. App'x 834, 837 (11th Cir. 2012) (citing *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1385 (11th Cir. 2005)). As provided by 29 C.F.R. § 825.303(b):

> [w]hen an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave. Calling in "sick" without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act. The employer will be expected to obtain any additional required information through informal means. An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying.

*Id.* Thus, while an employee need not expressly mention the FMLA, he must provide "at least verbal notice sufficient to make the employer aware of both the need for qualifying leave and its anticipated timing and duration." *Lee,* 450 F. App'x at 836 (citing 29 C.F.R. §§ 825.301(b) and 825.303(b)). Notice may include "that a condition renders the employee unable to perform the functions of the job" or "whether the employee . . . is under the continuing care of a health care provider." 29 C.F.R. § 825.303(b). Ultimately, the sufficiency of notice "depends on the facts and circumstances of each individual case." *Escriba v. Foster Poultry Farms,* 793 F. Supp. 2d 1147, 1160 (E.D. Cal. 2011) (citing 29 C.F.R. § 825.303(a)).

Spirit argues that it is entitled to summary judgment because Bralo: (1) failed to notify Spirit of his need for additional FMLA leave; (2) failed to provide Spirit with an explanation of what "serious medical condition" merited this extension; (3) and refused to provide the medical information necessary for Spirit to approve his request. Bralo counters that he: 1) notified Spirit of the need for FMLA leave, and 2) explained the reasons for the needed leave so as to allow Spirit to determine if the leave qualifies under FMLA, as required by 29 C.F.R. § 825.301(b). The Court will address each of Spirit's arguments in turn.

### 1.  Failure to provide notice

Spirit first argues that Bralo did not notify Spirit that he needed FMLA leave. Rather, Spirit argues, Bralo dealt exclusively with Aetna, Spirit's third-party leave administrator. (DE 38-4 at 13-14). Additionally, Spirit argues, Bralo himself conceded that he believed his FMLA extensions were "automatic" as long as he kept submitting medical records, rather than something he had to request. (DE 38-4 at 16).

In addressing this argument, the Court begins by noting that while undisputed record evidence indicates that Bralo may have initially dealt only with Aetna concerning his FMLA leave, a shift occurred shortly before May 4, 2012, when Bralo's FMLA leave was set to expire.  Bralo treated with physician's assistant, Patricia Tucker, almost every week; he saw her on April 27, 2012, at which time she indicated he could return to work on May 5, 2012. (DE 38-4 at 18). Aetna, seemingly, aware that this was Bralo's return to work date, instructed Bralo to contact Spirit's HR department to discuss his job status and "how he was to proceed." (DE 38-4 at 2). Bralo contends that he spoke with Ms. Lang prior to May 4, 2012. (De 38-4 at 2). Telephone records reflect that Bralo placed calls to Aggie Lang, Spirit's Leave Coordinator, on April 2, 19, and 30, 2012, and again on May 1, 2012. (DE 38-4 at 2; DE 49-

14; DE 49-15). Bralo's call to Ms. Lang on April 30, 2012, lasted nine minutes. (DE 49-14; DE 49-15; DE 49-17 at 6).

On April 30, 2012, Ms. Tucker faxed Ms. Lang a status in the form of a doctor's note stating that Bralo was under her care for "herniated lumbosacral discs with radiculopathy from 3/2/12." (DE 49-15; DE 49-16). Ms. Lang denies receiving any documents from March 2012 until May 4, 2012, from any physicians treating Bralo. (DE 49-19 at 15). Ms. Lang instructed Bralo to call his supervisor, Rob Corrieveau; Bralo did, but Mr. Corrieveau never returned Bralo's call. (DE 38-4 at 2-3). Bralo, having difficulty getting an answer from Spirit about what his job status was, tried calling Aetna to determine the status of his FMLA leave and his job. (DE 38-4 at 3). However, because Aetna never returned his call, and because Aetna had previously instructed him to communicate with Ms. Lang going forward, Bralo believed he was now to deal with Spirit concerning additional leave. (DE 38-4 at 3). Indeed, the Court notes that Aetna's May 7, 2012, letter to Mr. Bralo confirms that Bralo was correct in his belief: "If you are unable to return to work on May 7, 2012, please contact Spirit regarding your job status and benefits." (DE 49-2). It is undisputed that Bralo had FMLA leave remaining; indeed, at the time of his termination, he used 9.20 weeks and had a remaining 2.80 weeks available under the 12 weeks allowed under FMLA. (DE 49-1).

Thus, there is evidence in the record that: Bralo did not deal exclusively with Aetna regarding his FMLA leave; he had been in contact with Ms. Lang during the course of his FMLA leave and had given her status updates; Aetna instructed Bralo to contact Spirit's HR department before his FMLA leave expired to determine how he was to proceed;[4] Bralo

---

[4] According to Ms. Lang, in her five years as leave administration manager, Aetna had previously directed employees unable to return to work to contact Spirit directly. (DE 49-19 at 17).

contacted Ms. Lang after receiving that instruction; and Aetna memorialized this directive in a letter.

There is also record evidence that, while Bralo believed his FMLA extensions were automatic and not something he had to request, the information he contends he conveyed to Ms. Lang was sufficient to put her on notice that he sought an FMLA leave extension. When Bralo's next appointment with Ms. Tucker on May 4, 2012, resulted in her determination that he could not return to work on May 5, 2012, Bralo contacted Ms. Lang. (DE 38-8 at 2-3, 18, 19).[5] Ms. Lang cannot recall if she spoke with Bralo on May 4, 2012, but phone records indicate that Bralo did, indeed, place a call to Ms. Lang's direct line that lasted two minutes. (DE 49-16, DE 49-17 at 6, 8; DE 49-18; DE 49-19 at 30).

According to Bralo, during their two-minute conversation, he confirmed that Ms. Lang received Ms. Tucker's doctor's note memorializing her determination, which stated, "Serge Bralo is still under my care for herniated L-5 disc c [with] radiculopathy, last seen today and may not return to work until next eval 5/11/12." (DE 49-6).   Bralo contends that they discussed what was in the note, including the fact that Bralo could not return to work until after his next appointment, which was May 11, 2012. (DE 38-4 at 17, 19). Ms. Lang contends that, while she received the doctor's note, it was illegible and she assumed it had to do with Bralo's return to work on May 5, 2012.[6] (DE 49-19 at 17). The Court notes that a letter prepared by Ms. Lang in February 2013 included the content of the May 4, 2012 note (DE 49-19, at 17). Bralo, who contends that they discussed the contents of the note, argues that "if she wouldn't have been able to read it, I would hope she would tell me she couldn't read it." (DE

---

[5] According to Bralo, this was not the first conversation he had with Ms. Lang regarding his FMLA leave; he contends she called him early on in his leave to find out his status. (DE 38-4 at 20).
[6] Ms. Lang received from Aetna notification that Bralo's FMLA leave expired on May 4, 2012. (DE 49-19 at 15).

38-4 at 19). Evidence indicates that Bralo re-faxed the May 4, 2012, doctor's note on May 7, 2012. (DE 49-6). Phone records indicate that he called Ms. Lang twice that day. (DE 49-18).

Bralo also contends that he spoke with Ms. Lang sometime around May 14, 2012. (DE 38-4 at 5). Bralo's phone records support this contention; they suggest that he spoke with someone calling from Spirit's HR line—he contends it was Ms. Lang—on May 10, 2012, for five minutes; that he made two calls lasting approximately 1 minute each on May 15, 2012, one to Ms. Lang's number and one to the number of a Spirit leave analyst; and that he had made two phone calls to Ms. Lang on May 16, 2012, which lasted for six minutes and one minute, respectively. (DE 49-17 at 6, 7; DE 49-18).

A factual dispute exists about the sufficiency of the notice Bralo provided Spirit. The dispute centers on whether Aetna instructed Bralo to deal with Spirit directly if he needed further FMLA leave. Bralo contends—and phone records support—that he communicated with Ms. Lang during the course of his FMLA leave; he contends that Ms. Lang was aware that he could not return to work on May 5, 2012, due to his ongoing medical treatment. She contends that she was not. There is evidence that Ms. Lang was faxed doctor's notes on April 30, 2012, and May 4, 2012, that listed Bralo's medical condition; Ms. Lang disputes that she received the April 30 note and contends she could not read the May 4 note, although she later included the contents of the May 4 note in a letter. Ultimately, disputes of material fact clearly exist about the sufficiency of the notice Bralo provided Spirit that, when viewed in the light most favorable to Bralo, preclude summary judgment on this issue.

2. *Failure to explain serious medical condition*

Spirit's second argument is that Bralo failed to provide Spirit with an explanation of his medical condition or the medical necessity for any needed FMLA leave.

In challenging the sufficiency of the information Bralo provided, Spirit does not address the doctor's note Ms. Lang received on May 4, 2012. Rather, Spirit focuses on the note Ms. Lang received on May 14, 2012, which stated that "Serge may return to work 5/20/12 @ limited duty; reduce schedule to accommodate physical therapy, lifting limited to 20 lbs. Avoid repetitive bending/stooping." (DE 49-7; DE 49-19 at 15, 18).[7] Spirit argues that this note is insufficient because it simply listed physical restrictions, but did not identify any medical condition or any other medical information. However, the May 4, 2012, doctor's note, which Ms. Lang concedes she received, includes information sufficient to notify Spirit of Bralo's medical condition—a herniated disc with radiculopathy—as well as the fact that Bralo was still under his medical practitioner's care, and had been since early March.[8] If Ms. Lang could not read it, as she contends, there is evidence in the record suggesting that she had the opportunity to ask Bralo or his doctors for clarification or additional information. *See generally Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1004 (6th Cir. 2005) (employers who receive information from employee's doctors that they deem insufficient should seek clarification from the doctor). Additionally, there is evidence that she was able to read the note. (DE 49-19, at 17). There is also evidence that she was faxed a similar doctor's note even before then, on April 30, 2012, although she disputes that she received it, that also

---

[7] An employer cannot be expected to conclude that an employee requested FMLA leave when an employee phones in "sick" or provides doctor's notes "for unspecified ailments." *Andrews v. CSX Transp., Inc.*, 737 F. Supp. 2d 1342, 1352 (M.D. Fla. 2010). However, in Bralo's case, both the April 30, 2012 and May 4, 2012 doctor's notes specified the ailment: a herniated disc with radiculopathy.

[8] The content of a notice by an employee to an employer may include "whether the employee . . . is under the continuing care of a health care provider." 29 C.F.R. § 825.303(b).

included information about Bralo's condition. (DE 49-15; DE 49-19 at 15). Even if, as Ms. Lang contends, she believed the note had been Bralo's medical practitioner releasing him back to work on May 5, 2012, Ms. Lang would still have needed to know what it said in order to determine if he was medically cleared to return to work.

A factual dispute exists about whether Bralo provided Spirit with an explanation of his serious medical condition. Evidence exists that Spirit received two doctor's notes with Bralo's medical condition listed on it. Spirit contends that it did not receive the first and could not read the second. However, evidence exists suggesting that Ms. Lang was able to read the note. Bralo also contends that he discussed the contents of the second note with Ms. Lang. Ultimately, disputes of material fact exist about whether Bralo provided Spirit with an explanation of his serious medical condition that, when viewed in the light most favorable to Bralo, preclude summary judgment on this issue.

### 3.   Failure to provide further medical information

Spirit's third argument is that Bralo refused, upon request by Ms. Lang, to provide further medical information[9] to allow Spirit to substantiate his FMLA leave. Spirit, as Bralo's employer, had the right to seek information from Bralo to determine if his leave was FMLA-qualifying; Bralo, as Spirit's employee, had an obligation to prove the information necessary to determine whether his absence was potentially FMLA-qualifying.  29 C.F.R. §§ 825.301(a) and 825.303(b).

The Court notes, however, that Spirit's delay in seeking this information—30 days after Bralo gave Ms. Lang notice that he was able to return to work—runs afoul of Bralo's

---

[9] At least one court has determined than an employer's request for medical certification pursuant to the FMLA is strong evidence that an employer knows an employee's request for leave was potentially FMLA eligible. *Peter v. Lincoln Technical Inst., Inc.*, 255 F. Supp. 2d 417, 441 (E.D. Pa. 2002).

rights under the FMLA to be reinstated upon his notifying Spirit that he could return to work. An employer's duty to reinstate an employee is triggered "once an employee submits a statement from [his] health care provider which indicates that [he] may return to work." *Brumbalough*, 427 F.3d at 1004. If the employer decides that a doctor's note is insufficient as a fitness-for-duty certification, the employer should seek clarification from the employee's doctor. *Id.* This right to reinstatement is not absolute, however, and is conditioned on the employee's timely return to work and ability to perform the "essential functions of the position he left." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 247-49 (6th Cir. 2004). Nonetheless, "[a]n employee may not be required to take more leave than necessary to address the circumstances for which leave was taken," which would "violate the FMLAs prohibition against interfering with FMLA rights." *Hoge*, 384 F.3d at 247 (citations omitted).

Here, Spirit received a doctor's note from Bralo's treating medical provider on May 14, 2012, indicating that Bralo could return to work on May 20, 2012: "Serge may return to work 5/20/12 @ limited duty; reduce schedule to accommodate physical therapy, lifting limited to 20 lbs. Avoid repetitive bending/stooping." (DE 49-7; DE 49-19 at 18). Bralo contacted Ms. Lang after she received the May 14, 2012, note, at which time Ms. Lang advised Bralo that he should get his doctor to lift his restrictions because they only way Spirit would take him back is if he were at "100 percent." (DE 38-4 at 4, 5). At that time, Ms. Lang did not request that Bralo provide her with the fitness-for-duty certification that she needed to return him to work. (DE 49-19 at 19). She did not contact him until over 30 days had passed; then, she sent him a letter dated June 14, 2012,[10] requesting, among other things, that Bralo

---

[10] Although the letter was dated June 14, 2012, it is undisputed that Bralo did not receive the letter until June 21, 2012. (DE 49-11 at 5). Indeed, the Court notes that Spirit did not mail the letter until June 18, 2012. (DE 49-11 at 5).

have his physician complete a fitness-for-duty questionnaire in order to "assess your ability to perform the essential functions of your position." (DE 49-11 at 1).

This delay is problematic; while Spirit was not required to reinstate Bralo unless he could perform his essential job functions, it was prohibited from making Bralo take more FMLA leave than necessary. Ms. Lang's June 14, 2012, letter indicates that she could not make a determination about whether Bralo could perform the essential functions of his position until Bralo filled out the fitness-for-duty certification attached to the letter. However, since Ms. Lang delayed sending the form to Bralo over 30 days, her inaction caused Bralo to take more FMLA leave "more leave than necessary to address the circumstances for which leave was taken," which the FMLA prohibits. *Hoge*, 384 F.3d at 247. Having not heard from Ms. Lang, or the supervisor he called to find out his job status at Ms. Lang's instruction, Rob Corrieveau, Bralo retained counsel. (DE 38-4 at 23-24).

Thus, when Bralo received Ms. Lang's letter on June 21, 2012—which requested all documentation be provided by June 22, 2012, the next day—Bralo's counsel, Gina Cadogan provided Ms. Lang with a letter notifying her that she represented Bralo and requesting Ms. Lang or Spirit's counsel contact her to discuss Bralo's job status. (DE 49-12). That letter also requested an extension of time within which to respond to Ms. Lang's June 14, 2012, request for medical information. (DE 38-3 at 57-59; DE 38-4 at 26-27, 30-31). Ms. Lang did not respond to Bralo's counsel; instead, on June 25, 2012, Ms. Lang called Bralo and left a voicemail stating that Bralo had until June 29, 2012, to respond to Spirit. (DE 38-3 at 56; DE 38-4 at 26-27, 30 -31, 32, 37-4; DE 49-19 at 30).

On June 28, 2012, Bralo's counsel sent Ms. Lang another letter requesting that she contact her to discuss whether Spirit would accommodate Bralo's physical restrictions and

asking if the extension Ms. Lang mentioned in her voicemail related to the time by which Bralo had to send the medical information or the time by which Bralo had to return to work. (DE 49-13). Ms. Lang received these letters but did not contact Bralo's counsel. (DE 49-19 at 30). That day, however, Ms. Lang again called Bralo to remind him of the June 29 deadline. (DE 38-4 at 31, 39). She called him again on June 29, 2012, to remind him of the deadline. (DE 38-4 at 31, 39). Ms. Lang terminated Bralo on July 3, 2012. (DE 49-14; DE 49-19 at 3).

A factual dispute exists about Bralo's attempt to get medical records to Spirit. There is evidence in the record that neither Bralo nor his counsel provided the medical records to Spirit, however, there is also evidence that this failure arose because Spirit—who had previously failed to communicate with Bralo upon receiving notification that he was ready to return to work—failed to communicate with Bralo's counsel in her attempt to resolve the issue. Ultimately, disputes of material fact exist which, when viewed in the light most favorable to Bralo, preclude summary judgment on his FMLA interference claim (Count 1).

### C. Count 2: FMLA Retaliation

Spirit's motion is denied as to Count 2 because there is a genuine issue of material fact regarding the reason Spirit ultimately terminated Bralo's employment.

"[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Maack v. Sch. Bd. of Brevard Cnty.*, 6:12-CV-612-ORL-28, 2013 WL 6050749, at *8 (M.D. Fla. Nov. 15, 2013) (citing *Strickland*, 239 F.3d at 1207). Specifically, Plaintiff must show that "his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* If there is no "direct evidence of the employer's intent, [courts] apply the *McDonnell Douglas* burden-shifting framework." *Id.*

Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence; that is, the plaintiff must "establish facts adequate to permit an inference of discrimination." *Id.* (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)).

To make a prima facie showing of FMLA retaliation, a plaintiff must establish: (1) that he engaged in FMLA-protected activity; (2) that he was subjected to a materially adverse action by his employer; and (3) a causal connection between the activity and the adverse action. *Id. (citing Strickland* at 239 F.3d at 1207). To establish a causal connection, a plaintiff must show "that the protected activity and the adverse action were not wholly unrelated." *Id.* (citing *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985)). "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Labrousse v. Caribbean Airmail, Inc.*, 09-23529-CIV, 2011 WL 3516029, at *6 (S.D. Fla. Aug. 11, 2011) (citing *Brungart v. BellSouth Telecomms.*, Inc., 231 F.3d 791, 799 (11th Cir. 2000)).

If the plaintiff establishes a prima facie case, a presumption of discrimination arises, and the "burden 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason' for its actions." *Maack*, 2013 WL 6050749, at *8 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "If the [employer] does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.* (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)).

Ultimately, a jury question exists if a plaintiff can establish a prima facie case and evidence exists "sufficient to permit a reasonable fact-finder to disbelieve the defendant's proffered reasons for the challenged action." *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1372 (S.D. Fla. 1999) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir.1997), cert. denied, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998)).

Bralo's FMLA retaliation claim is premised upon his July 3, 2012 termination. Spirit argues that this claim must fail because (1) he never engaged in a protected FMLA activity with regards to Spirit; (2) he was not entitled to job restoration because he was not returning from authorized FMLA leave; and (3) Spirit was not required to restore his job based on Bralo's inability to perform his essential job functions and his refusal to submit a fitness-for-duty certification.

Bralo, in turn, argues that there is direct evidence of Spirit's retaliation against him for attempting to avail himself of FMLA benefits: he was not permitted to return to work, he would not have been permitted to take intermittent leave to attend to his physical therapy had he been allowed to return to work, and he was ultimately fired for what Spirit deemed were "unsubstantiated" absences. Direct evidence is "evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-582 (11th Cir. 1989)(discussing standard for direct evidence in ADEA context). However, the standard is high, and "only the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute[s] direct evidence of discrimination." *Id*. The facts Bralo alleges provide direct evidence of Spirit's retaliatory intent, however, are not so "blatant" that their "intent could be nothing other than to discriminate." *Id*. Accordingly, the Court evaluates Bralo's FMLA retaliation claim using the *McDonnell Douglas* framework.

### *1. Protected activity*

To establish a prima facie case of retaliation, Bralo must first demonstrate that he engaged in activity protected by the FMLA. Spirit argues that Bralo's claim must fail because he was not returning from authorized FMLA leave. However, evidence exists that Bralo sought an extension of his FMLA leave—an activity protected by the FMLA—and that he provided Ms. Lang sufficient notice of his need for additional leave. More specifically, Ms. Lang was aware that Bralo had been on FMLA since March 2, 2012;[11] both Bralo's April 30, 2012, and May 4, 2012 doctor's notes indicate that Bralo had been under Patricia Tucker's care since March 2012 for a herniated disc with radiculopathy; Ms. Lang knew from the Aetna notification that Bralo's leave expired May 4, 2012;[12] and, according to Bralo, he called Ms. Lang to discuss his doctor's note. While Ms. Lang cannot recall if she spoke with Bralo on May 4, 2012, phone records indicate that Bralo placed a call to Ms. Lang's direct line that lasted 2 minutes. (DE 38-4 at 2-3, 18, 19; DE 49-16; De 49-17 at 6, 8; DE 49-18; DE 49-19 at 30).

Additionally, Bralo contends that during this call, they discussed the content of the note, including the fact that Bralo could not return to work until after his next appointment on May 11, 2012. (DE 38-4 at 17, 19). Bralo also contends that he spoke with Ms. Lang sometime around May 14, 2012. (DE 48-4 at 5). Bralo's phone records support this contention; they indicate that he spoke with someone calling from Spirit's HR line—he contends it was Ms. Lang—on May 10, 2012, for five minutes; that he made two calls lasting approximately 1 minute each on May 15, 2012, to Ms. Lang's number and to the number of a

---

[11] Aetna notified Ms. Lang that Bralo was on medical leave beginning in March 2012. (DE 38-4 at 15; DE 49-19 at 13).

[12] Aetna notified Ms. Lang that Bralo's FMLA leave expired on May 4, 2012. (DE 49-19 at 15).

Spirit leave analyst; and that he had made two phone calls to Ms. Lang on May 16, 2012, which lasted for six minutes and one minute, respectively. (DE 49-18, DE 49-17 at 6, 7). Bralo and Ms. Lang's differing versions of their communications, coupled with the phone records, create a factual dispute regarding whether Bralo engaged in protected activity.

### 2.  Materially adverse action

Under the *McDonnell Douglas* framework, Bralo must next demonstrate that he was subjected to a materially adverse action by his employer. It is undisputed that he was terminated on July 3, 2012. (DE 49-14).

### 3.  Causal connection

Under the third and final prong, Bralo must demonstrate a causal connection between the activity and the adverse action. Spirit argues that Bralo cannot show such a causal connection because Bralo's intervening action—his failure to provide a fitness-for-duty certification—negates the inference of causation that may arise from temporal proximity. *Maack*, 2013 WL 6050749, at *9 (citing *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520 (11th Cir. 2007)). Bralo argues that myriad reasons exist to infer a causal connection between his attempts to take additional FMLA leave and his termination, including: Spirit's refusal to permit Bralo to return to work after the May 14, 2012, note; Ms. Lang's advising Bralo to have his restrictions lifted because he had to be at 100% before he could return to work; Spirit's over 30-day delay in contacting Bralo about his job status; and Spirit's failure to contact Bralo's counsel, as requested.

As previously discussed, Spirit's refusal to communicate with Bralo's counsel about his return to work creates a dispute surrounding why Spirit ultimately failed to get a fitness-for-duty certification from Bralo. The Court agrees with Bralo that a finder of fact could infer

from Ms. Lang's actions and inactions following her receipt of the May 14, 2012, note that Bralo was terminated for his attempt to engage in a protected activity.

First, Ms. Lang conveyed inaccurate information to Bralo's supervisors about Bralo's return and then offered to help them replace Bralo. After receiving the May 14, 2012, note, Ms. Lang emailed Bralo's supervisors, including Robert Corrieveau, advising that Bralo could not return to work until he could return to full duty: "I received a note from Serge's doctor releasing him to return to light duty work on 5/20/12 with a reduced schedule and multiple restrictions. Unfortunately we do not have a light duty program for non-occupation related injuries or illness therefore he will be unable to return to work until we receive a full duty release with no restrictions." (DE 49-8). This was unwelcome news: one of Bralo's supervisor's, Tommy Andino, noted that Bralo had been out for a long time and asked, "When can I get a replacement for him as it is putting stress on our operation[?]" (DE 49-8; DE 49-9) Ms. Lang advised him to "Please check with Meisha. I can provide her any documents she needs." (DE 49-5).

Second, Ms. Lang conveyed inaccurate information to Bralo about when he could return and then told Bralo's supervisor's he had been out on unauthorized leave. Her last communication with Bralo had been that he could not return to work until he was 100%; she did not contact him after that communication; 30 days passed. (DE 38-4 at 4, 5; DE 49-19, at 19). Then, on June 13, 2012, Ms. Lang sent an email to Mr. Andino and Human Resources stating "As previously discussed with you, Mr. Bralo has been out on unauthorized leave of absence since 05/04/12 and continues to do so. Your thoughts?" (DE 49-10).

A factual dispute exists about the reasons Spirit terminated Bralo. Although Bralo never provided a fitness-for-duty certification, Ms. Lang incorrectly told Bralo and his

supervisors that Bralo could not return to work until he was released with no restrictions; Ms. Lang did not communicate further with Bralo, then emailed his supervisors and reported that he had been out on unauthorized leave, despite the fact that she told him he could not return to work. Finally, when she did communicate with Bralo, she refused to speak with Bralo's counsel who was working on his behalf. Ultimately, disputes of material fact exist which, when viewed in the light most favorable to Bralo, preclude summary judgment on this issue.

### 4. Legitimate Non-discriminatory Reason/Evidence of Pretext

If the plaintiff establishes a prima facie case, a presumption of discrimination arises, and the "burden 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason' for its actions." *Maack*, 2013 WL 6050749, at *8 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "If the [employer] does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.* (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)).

Spirit's alleged "legitimate, non-discriminatory reason for its actions" is that Bralo failed to substantiate his May 4, 2012 to May 14, 2012 absences, failed to provide a fitness-for-duty certification, failed to engage in the interactive process, and had an unauthorized 60 day absence. [13] Bralo argues that Spirit's reasons are pretextual, since neither Ms. Lang nor his supervisor returned him to work or otherwise communicated with him despite his advising them that he could return on May 20, 2012.

---

[13] The Court also notes that while Ms. Lang contends that Bralo was ultimately terminated for "job abandonment" because "there was no interaction with him or his communicating that he intended to return to work" (DE 49-19 at 12), this is simply untrue; Ms. Lang's email to Bralo's supervisors on June 13, 2012, indicates that she knew he was ready to return to work on May 20, 2012.

The Court has already discussed why Spirit's refusal to communicate with Bralo's counsel creates a dispute about why Spirit did not get the fitness-for-duty certification from Bralo. Spirit's other proffered reasons for terminating Bralo—that he failed to substantiate his May 4, 2012 to May 14, 2012 absences, failed to engage in the interactive process, and had an unauthorized 60 day absence—may be addressed in similar fashion. The failure of anyone at Spirit to communicate with Bralo after he advised them of his ability to return to work suggests that their proffered reasons are pretext. Ms. Lang contends that she did not communicate with Bralo after May 14, 2012, because the June 14, 2012, letter requested the information she needed. (DE 49-19 at 19-20). But this explanation, in light of the inaccurate information she conveyed Bralo and his supervisors—which arguably kept Bralo out on unpaid leave for an extra month—coupled with her suggestive communications to Bralo's supervisors and subsequent refusal to communicate with Bralo's counsel, suffices to create a question of fact about whether Spirit's reasons for terminating Bralo were pretext.

Ultimately, disputes of material fact exist which, when viewed in the light most favorable to the Bralo, preclude summary judgment on his FMLA Retaliation claim (Count 2).

### D. Count 3: ADA Discrimination/Count 4: FCRA Discrimination[14]

Spirit's motion is denied as to Counts 3 and 4 because there is a genuine issue of material fact regarding whether Spirit failed to accommodate Bralo's disability. To state a prima facie claim for failure to accommodate, the plaintiff must show that: (1) he is disabled; (2) he is a qualified individual; and (3) he was discriminated against by way of the

---

[14] These two claims are analyzed together because federal cases construing the ADA are equally applicable to analogous claims under the FCRA. *Foley v. Morgan Stanley Smith Barney, LLC*, 0:11-CV-62476, 2013 WL 795108, at *4 (S.D. Fla. Mar. 4, 2013) (citing *Holly v. Clairson Indus., LLC.*, 492 F.3d 1247, 1255 (11th Cir. 2007)).

defendant's failure to provide a reasonable accommodation. *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)).

As applicable to this case, an ADA disability is a "physical or mental impairment that substantially limits a major life activity." *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1100 (S.D. Ga. 1995) (citing 29 C.F.R. § 1630.2(g)). A physical impairment includes "any physiological disorder or condition affecting, as is applicable here, the body's musculoskeletal or neurological systems." *Id.* (citing 29 C.F.R. § 1630.2(h)). To be a disability, an impairment must "substantially limit[] one of the individual's major life activities." *Id.* (citing 29 C.F.R. Pt. 1630, App. § 1630.2(j)). Major life activities "may include functions such as performing manual tasks, walking, working, sitting, standing, and lifting." *Id.* (citing 29 C.F.R. Pt. 1630, App. § 1630.2(i)). "A person is substantially limited in these activities if, as compared to an average person in the general population, he is significantly restricted as to the condition, manner or duration under which he can perform a major life activity." *Id.* (citing 29 C.F.R. § 1630.2(j)).

Spirit does not dispute that Bralo is disabled; rather, Spirit argues that Bralo's ADA/FCRA failure to accommodate claims cannot survive summary judgment because Bralo was not a qualified individual, refused to engage in the interactive process, and cannot show that Spirit regarded him as disabled. Bralo, in turn, argues that he is a qualified individual and that Spirit caused the breakdown in the interactive process.

### 1. Whether Bralo is a qualified individual

Spirit argues that Bralo is not a qualified individual because he could not perform the essential functions of his job and did not demand a specific accommodation. A qualified

24

individual with a disability is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." *McKane,* 363 F. App'x at 681 (citing 42 U.S.C. § 12111(8)). An employee "must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." *Id.* (citing *Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000)).

a)   Essential functions

Essential functions are "the fundamental job duties of the employment position the [disabled employee] holds or desires." *Haysman*, 893 F. Supp. at 1101 (citing 29 C.F.R. § 1630.2(n)(1)). "Essentiality" is evaluated "on a case-by-case basis by examining a number of factors." *Davis*, 205 F.3d at 1305. These factors include, but are not limited to:

> (i) the employer's judgment about which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function: (v) terms of a collective bargaining agreement; (vi) work experience of past incumbents of the job; and/or (vii) the current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Spirit contends that Bralo's limitations—to avoid lifting over 20 pounds and repetitive bending and stooping—would prevent him from performing his essential job functions. Spirit bases its judgment about the essential functions of Bralo's position on the written job description for an airline maintenance supervisor. According to Spirit, Bralo had to perform the same physical activities as the lead mechanics he supervised, including climbing on and working off aircraft stands and in aircraft compartments. In sum, Spirit argues that returning

Bralo to work with his restrictions would be tantamount to removing the physical aspects of Bralo's job. Removing those aspects, it argues, would prevent Bralo from directly observing his subordinate's work, replicating that work, or filling in on the job. Spirit contends that the work could not be distributed amongst Bralo's six subordinates because of demands placed on them in a fast-paced environment. Because Bralo's job involved airline safety, Spirit contends, the consequences of his not performing all the aspects of his supervisory role would be obvious and undisputed.

Bralo argues that a determination of his job's essential functions requires more than an examination of his written job description, upon which Spirit solely relies. (DE 49-19 at 10, 11). For example, although Bralo's job description required that he be able to lift up to 50 pounds, he contends that, in practice, he lifted only occasionally, noting, "I wasn't lifting things because I was the supervisor, but I suppose in a pinch, yes." (DE 38-4 at 8, 28). Bralo also contends he was not unable to bend and stoop; he just had to be careful. (DE 38-4 at 23). Additionally, Bralo identified a previous Spirit employee with a back injury who worked as a maintenance supervisor who had similar, if not more restrictive, limitations. (DE 38-4 at 10). Bralo was also scheduled to attend physical therapy. (DE 34-8 at 5).

There is a dispute of fact as to whether Bralo's limitations would prevent him from performing his job's essential functions. While Spirit's judgment, as expressed in the written job description, must be given consideration, it is not the only factor to consider. Other factors include the amount of time spent on a function and the experience of past incumbents in the job. Bralo, a past incumbent of the job, stated that, as a supervisor, he only lifted things on occasion and "in a pinch." There is also evidence in the record that Spirit employed someone as an aircraft maintenance supervisor who may have had even more extensive lifting and

physical activity restrictions than Bralo. Thus, while Spirit argues that the consequences of Bralo's not performing the physical activities of his job are "obvious and undisputed," given Bralo's responsibility of ensuring safety of the flying public, there is evidence that a past supervisor had limitations at least as restrictive as Bralo's. This suggests that the safety goals expressed by Spirit could be accomplished even if it accommodated Bralo's restrictions.

Ultimately, a factual dispute exists, when viewed in the light most favorable to Bralo, about whether lifting more than 20 pounds and bending and stooping are essential functions of Bralo's job and whether Bralo could perform these essential jobs functions with or without a reasonable accommodation.

### b)   Reasonable accommodation

An accommodation is reasonable and required only if it enables the employee to perform an essential job functions. *McKane, 3*63 F. App'x at 681 (citing *Lucas*, 257 F.3d at 1255). An employee with a disability is not entitled to the accommodation of his choice, but only to a reasonable accommodation. *Id.* (citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)). Reasonable accommodations may include: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* (citing 42 U.S.C. § 12111(9)(B))."The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id.* (citing *Lucas*, 257 F.3d at 1255–56). An employer's "duty to provide a reasonable accommodation is not

triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 2007).

Spirit argues that Bralo never asked Spirit for a specific accommodation because Bralo's May 12, 2012, doctor's note did not suffice as a request for an accommodation. However, Bralo stated that he spoke with Ms. Lang about his restrictions. (DE 38-4 at 23). Bralo argues that his request that he not have to lift more than 20 pounds and that he avoid repetitive bending and stooping were "sufficiently direct and specific" to trigger Spirit's duty to provide a reasonable accommodation.

Spirit cites to a Middle District of Florida case, *Maack v. Sch. Bd. of Brevard Cnty.*, 6:12-CV-612-ORL-28, 2013 WL 6050749, at *12 (M.D. Fla. Nov. 15, 2013) for the proposition that a doctor's note listing restrictions did not constitute a request for an accommodation. In *Maack*, the court based its doctor's note determination on another Middle District case, *Hickmon v. TECO Energy*, No. 8:10–cv–1147–T–30MAP, 2012 WL 39582 (M.D. Fla. Jan. 9, 2012). In *Hickmon*, the court determined that "[P]ointing to a physician's note regarding light duty or part-time work, without something more, is insufficient to constitute a request for an accommodation under the ADA." *Hickmon* 2012 WL 39582, at *5. *Hickmon*'s reasoning was based on an Eleventh Circuit decision dealing with a similar situation, *Warren v. Volusia Cnty, Florida*, 188 Fed. App'x. 859 (11th Cir. 2006). *Warren*, however, premised its determination that a doctor's note was an insufficient accommodation request on the fact that plaintiff's "physician was not acting as her representative, and, therefore, his notations that light duty or sedentary jobs were necessary did not constitute a request for an accommodation." *Warren*, 188 F. App'x at 862-63. Thus, the origin of the

28

determination in *Maack* on which Spirit relies is premised on the origin, rather than the content, of the note.

The distinction between origin and content of the note is one the Court considers important. Ms. Lang contends that Bralo never identified or asked Spirit for a specific accommodation for his physical restrictions. (DE 38-4 at 23, 37-40). However, although Bralo stated that he never requested a specific accommodation, Bralo contends that he discussed his restrictions with Ms. Lang on May 14, 2012; he asked to be returned to work, with his restrictions, and "see what happened." (DE 38-4 at 5, 23, 28). At the very least, the June 21, 2012, letter from Bralo's counsel to Ms. Lang requesting that Ms. Lang or Spirit's counsel contact her to discuss accommodating Bralo's restrictions, as discussed in her letter, was a request for an accommodation. (DE 49-12).

Ultimately, Bralo's and Ms. Lang's conflicting testimony create a factual dispute, when viewed in the light most favorable to Bralo, about whether he requested a specific accommodation from Spirit, which precludes summary judgment on this issue.

### 2.   *Whether Bralo refused to engage in the interactive process*

Spirit next argues that Bralo refused to engage in the interactive process contemplated by the ADA. "The interactive process begins when an employee requests an accommodation." *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005). An employer who is aware of its responsibility to provide a reasonable accommodation "must make a reasonable effort to determine the appropriate accommodation." *Id.*  Both the employer and the employee have a duty to act in good faith during the interactive process. *Id.* (citing *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 333 (3d Cir. 2003)). "The absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation." *Id.*

29

(citing *Picinich v. United Parcel Serv.*, 321 F.Supp.2d 485, 514 (N.D.N.Y. 2004)). Ultimately, "[i]f a jury could conclude that [an employer] failed to engage in good faith in the interactive process, and that failure led to defendant not according reasonable accommodations to [the employee] in a timely manner, summary judgment cannot be granted." *Id.*

Spirit contends that Bralo failed to engage in the interactive process by not providing the medical information by Ms. Lang in mid-June. There is evidence in the record to suggest that the breakdown in the interactive process came earlier than that, however. On May 14, 2012, Bralo told Ms. Lang what his restrictions were and asked to be returned to work with those restrictions. (DE 38-4 at 4, 5). According to Bralo, Ms. Lang told him that Spirit would not accommodate his restrictions because he was not injured on the job. (DE 38-4 at 4, 23). Ms. Lang told him that he would be better served if he went back to his medical provider and had his physical restrictions lifted. (DE 38-4 at 4, 5). Ms. Lang contends that these statements to Bralo were "a poor choice of words. . . what I should have said was that we didn't have enough information." (DE 49-19 at 24). However, Ms. Lang did not attempt to correct the impressions that her "poor choice of words" caused. (DE 49-19 at 24). Indeed, she repeated them to Bralo's supervisors. (DE 49-8). Spirit contends that Ms. Lang did not say that Spirit would only accommodate on–the-job injuries; rather, it argues, she said Spirit had no light duty program for non-work related injuries. In any event, however, Ms. Lang does not dispute that she told Bralo he could not return to work until he had his restrictions lifted.

The Court notes that even if Bralo did not request an accommodation until his counsel's June 21, 2012, letter, Ms. Lang's refusal to speak or otherwise communicate with Ms. Cadogan after that accommodation request, coupled with the conflicting testimony on

this issue, creates a factual dispute about who caused the breakdown in the interactive process contemplated by the ADA.

### 3.   Whether Spirit regarded Bralo as disabled

Since Bralo is proceeding under a failure to accommodate theory, the Court need not address Spirit's contention that Bralo's "regarded as disabled" theory is fatal to his claim; the only mention of this theory is in the complaint, and it is not a separate claim that requires a determination of summary judgment.[15] As Bralo's failure to accommodate claim is premised on Spirit's failure to accommodate an actual disability, and as Spirit is not disputing that Bralo had a disability, no further analysis is needed.

Ultimately, disputes of material fact exists that, when viewed in the light most favorable to Bralo, preclude summary judgment on his ADA Discrimination (Count 3) and FCRA Discrimination (Count 4) claims.

### III.   <u>Conclusion</u>

For the forgoing reasons, Spirit's Motion for Summary Judgment (DE 38) is DENIED.

DONE and ORDERED in Chambers at West Palm Beach in the Southern District of Florida, this 19th day of March, 2014.

_____

DAVE LEE BRANNON
U.S. MAGISTRATE JUDGE

---

[15] "[T]here is no requirement that an employer provide a reasonable accommodation when disability is based on the 'regarded as' prong of the definition." _Lewis v. Florida Default Law Grp., P.L._, 8:10-CV-1182-T-27EAJ, 2011 WL 4527456, at *fn 29 (M.D. Fla. Sept. 16, 2011) (citing 42 U.S.C. § 12201(h); 29 C.F.R.§ 1630.2(o)(4)).